IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CRIMINAL ACTION
UNITED STATES OF AMERICA  *  08-044S
                          *
VS.                       *  DECEMBER 2, 2011
                          *
DAVID WHITAKER            *  PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Sentencing)

**REDACTED TRANSCRIPT**

**APPEARANCES**:

FOR THE GOVERNMENT:          ANDREW REICH, AUSA
                             U.S. Attorney's Office
                             50 Kennedy Plaza
                             Providence, RI  02903

FOR THE DEFENDANT:           GEORGE J. WEST, ESQ.
                             One Turks Head Place
                             Suite 312
                             Providence, RI  02903

Court Reporter:              Anne M. Clayton, RPR
                             One Exchange Terrace
                             Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

1    2 DECEMBER 2011 -- 9:00 A.M.

2         THE COURT:  Good morning.  This is the matter of

3    the United States versus David Whitaker.  We're here

4    for sentencing this morning.

5         Let's have counsel identify themselves for the

6    record, please.

7         MR. REICH:  Andrew Reich on behalf of the United

8    States of America.

9         MR. WEST:  George West for David Whitaker.

10        THE COURT:  Mr. West, can you confirm for me

11   that you've had the opportunity to review the

12   Presentence Investigation Report with your client and

13   you've been able to answer all of his questions?

14        MR. WEST:  I have, your Honor.

15        THE COURT:  And there are no objections to the

16   presentence report; is that correct?

17        MR. WEST:  That is correct.

18        THE COURT:  No objections from the Government

19   either, correct?

20        MR. REICH:  Yes, your Honor.

21        THE COURT:  All right.  Then I'll start by

22   setting forth on the record the advisory guideline

23   calculations as they are set forth in the presentence

24   report, and then we'll move to discussion of the

25   departure motion.

1          So we begin with paragraph 19, Group 1, which

2     involves Counts I and II.  The base offense level is

3     level 7.  There is a 20-point enhancement because the

4     loss in this case was greater than $7,000,000 but less

5     than $20,000,000.  There's an additional four-point

6     upward adjustment because the offense involved in

7     excess of 50 victims but less than 250 victims.

8     There's a two-point upward adjustment because the

9     Defendant was an organizer, leader or manager or

10    supervisor, and that yields an adjusted offense level

11    in this group of 33.

12          On Count III, the base offense level, which is

13    detailed in paragraph 27, is a level 22.  There's an

14    additional point added because the Defendant was

15    convicted under 18 U.S.C. 1957.  That yields an

16    adjusted offense level of 23.  And paragraph 34 details

17    the offense level for Group 1, which includes the

18    counts that I just relayed, and the combined offense

19    level, therefore, is 33.

20          Now, in Group 2, which is Count IV, the base

21    offense level is an 8.  There's an eight-point

22    adjustment because the bribe or improper benefit

23    conferred exceeded $5,000; and as set forth in the

24    presentence report, the plea agreement stipulated that

25    the loss relating to Count IV was more than 70,000 but

1    less than 120,000 and in accordance with Section

2    2B1.1(e), the offense level is increased by eight

3    levels.  That yields an adjusted offense level of 16.

4    So under the grouping rules, the combined offense level

5    in this case as detailed in paragraph 42 of the

6    presentence report reverts to the Group 1 level, which

7    is 33.

8         Now, there's a three-point downward adjustment

9    for acceptance of responsibility, so the final total

10   offense level is a level 30.

11        The Defendant's criminal history is summarized

12   in paragraph 50.  That paragraph indicates he has eight

13   criminal history points.  Two points are added because

14   he committed this offense while he was on probation in

15   regard to a previous matter.  That gives him ten

16   criminal history points and places him in criminal

17   history category of 5.

18        So at level 30, criminal history category of 5,

19   the Defendant's advisory guideline range is 151 months

20   to 188 months of incarceration.

21        Now, we have a downward departure motion by the

22   Government, so I'll hear you, Mr. Reich, on that.

23        MR. REICH:  Your Honor, there are a number of

24   factors that we would like to point out to the Court

25   that we consider to be relevant in imposing the

1  appropriate sentence in this case.  Some of those

2  factors were submitted to the Court in our motion that

3  we filed under seal pursuant to guideline Section

4  5K1.1, and we have nothing to say beyond what we've

5  already set forth on the record in that motion unless

6  there's something specific the Court would like to hear

7  from the Government on that particular point.

8       THE COURT:  No.  Why don't you and Mr. West,

9  since you're dealing with matters filed under seal, why

10  don't you both come up for a moment.

11       (Side-bar conference.)















21  (End of side-bar conference.)

22  THE COURT:  Mr. Reich, I'll hear you on the

23  Government's motion to depart.

24  MR. REICH:  Your Honor, as I stated previously,

25  there are a number of factors which the Government

1 believes the Court should take into consideration in

2 imposing the appropriate sentence in this case, and

3 included among those are the factors that we pointed

4 out in our motion for a downward departure under United

5 States guideline Section 5K1.1. And in that motion, we

6 described the nature of the Defendant's cooperation

7 with the Government and, again, I'll address some other

8 issues regarding sentencing later, but specifically

9 concerning his cooperation, I think it would be

10 accurate to describe his cooperation in this case and

11 the impact of his cooperation as being rather

12 extraordinary in the sense that after Mr. Whitaker was

13 sent out of Mexico and returned to the United States,

14 he was incarcerated here in Rhode Island. At that

15 point, we started to speak to him, and he told us about

16 a relationship that he had with Google and the fact

17 that he had been advertising the sale of unlawful

18 pharmaceutical products through Google's AdWords

19 program.

20 Based on that information, we initiated a

21 criminal investigation into what I would describe as

22 rogue pharmaceutical companies or rogue pharmacies that

23 were advertising the sale of controlled and

24 non-controlled prescription drugs through the Internet

25 using Google's AdWords program as a form of

1    advertising.  And based on our investigation, we came

2    to learn that when these companies advertise through

3    the Google AdWords program, this was an extremely

4    effective way in which they were able to reach United

5    States customers, and they were able to increase their

6    sales tremendously by advertising through that program.

7         So Mr. Whitaker provided cooperation to us by

8    telling us how he established a relationship with

9    certain customer service representatives at Google, how

10   he, while he was in Mexico, actually used the Google

11   AdWords program to advertise the sale of unlawful

12   pharmaceutical products to consumers in the United

13   States.  And based on that information, we actually

14   initiated an undercover operation, which lasted

15   approximately four months.  It was during the early

16   part of 2009.  Mr. Whitaker was very instrumental in

17   assisting us in setting up a number of undercover

18   websites which purported to sell unlawful

19   pharmaceutical products to consumers here in the United

20   States, representing that many of these products came

21   from drug distributors outside the United States.

22        Mr. Whitaker was instrumental in setting up

23   those websites and also providing information to us on

24   how we were able to contact people at Google and

25   contact various customer service representatives at

Google and engage in various types of contacts with them, which led us to understand that they were assisting in allowing these types of advertisements to occur and appear in Google's AdWords advertising program.

Our undercover operation lasted about four months. During that period of time, Mr. Whitaker was taken out of the prison facility on almost a daily basis for the purpose of assisting us. His assistance was very truthful. It was very complete. And he spent lengthy hours with us in setting up these websites and providing information to us.

Ultimately, the investigation went overt; and as a result of the undercover phase of the investigation, we learned a lot of other things about how the Google AdWords program operated and how what I've described as rogue pharmacies were able to advertise through the Google's AdWords program. And the investigation actually started with the undercover operation, started with Mr. Whitaker's information, but then led us to a greater understanding about some other things with respect to Google and its AdWords program and the rogue pharmacy advertising that was occurring.

Eventually, we entered into some discussions with Google about that program. We expressed and they

became aware of the fact that we were conducting a
criminal investigation, and those discussions
ultimately ended.  In August of this year, we entered
into a non-prosecution agreement with Google; and under
the terms of that agreement, which have been made
public already, Google agreed to pay $500 million, to
forfeit $500 million and that amount represented both
the revenue which Google itself received from the
unlawful advertising by these rogue pharmacies, plus
the revenue that was received by these rogue pharmacies
themselves.

But perhaps more importantly, as part of that
resolution of the case and leading to that resolution,
Google agreed to no longer permit rogue pharmacy
advertising to consumers here in the United States.
Specifically, they had allowed Canadian pharmacies,
many of which actually obtained their pharmaceutical
products from other countries, including countries in
Asia, so they changed their policy as a result of this
investigation and no longer permitted these Canadian
rogue pharmacies to target their advertisements to
consumers here in the United States.

In addition, as part of that agreement, they
agreed to institute a number of compliance measures and
to engage in regular reporting to us so that we can

1   insure and make sure that they're complying with the

2   steps that they said they would take to make sure rogue

3   pharmacies no longer advertised through the Google

4   AdWords program.  And based on what's happened so far,

5   they have taken those measures and they have, in fact,

6   made some reports to us when they've discovered rogue

7   pharmacies that somehow have gotten into the system,

8   they reported those things to us.

9          So the impact of the investigation has been

10  tremendous because there are literally millions of U.S.

11  consumers that would have clicked on these various

12  AdWords advertisements and would have obtained these

13  pharmaceutical products, many of which are prescription

14  drugs which people were obtaining without prescription;

15  many of which were drugs that were obtained from

16  foreign countries and consumers in the United States

17  would be getting those drugs without those drugs having

18  been first approved by the FDA to ensure their safety.

19         So as a result of this investigation, there are

20  literally millions of U.S. consumers who have been

21  saved from the dangers that they would have been

22  exposed to had these rogue pharmacies been permitted to

23  advertise on the Google AdWords program.

24         So in looking at Mr. Whitaker's cooperation, and

25  we can say that but for his cooperation this

investigation would not have taken off to start with and then it led to, you know, a very broad understanding of what Google was doing with respect to the pharmacy advertisement. But we've considered the significance, the usefulness of his cooperation, which as I've stated has been tremendous. We've considered the truthfulness and completeness of his cooperation, which also has been both very truthful and we consider to be very truthful and complete. The nature and extent of his cooperation, which I've already set forth to the Court. We've also considered, because this is one of the factors the Court is to consider, whether Mr. Whitaker was exposed to any injury or danger of any injury from his cooperation. On that particular point, we would say that the nature of his cooperation did not expose him to any injury or danger of injury.

And finally, the timeliness of his cooperation. And we could say that with respect to timeliness, it was very shortly after Mr. Whitaker was returned to Rhode Island after he had been arrested upon his return from Mexico. He was brought back to Rhode Island, and very shortly thereafter he contacted my office and said that he wanted to provide some information, and myself along with agents of the Food and Drug Administration went and sat with him and that's how the investigation

1    was initiated.  So he did begin to cooperate very soon

2    after his returning to Rhode Island.

3         So based on all of these considerations, we

4    believe that an appropriate departure in this case

5    would be a nine-level departure from the level 30 that

6    he is at right now, which would bring him down to a

7    level 21, and that is what we are recommending in this

8    particular case based on his cooperation, that he

9    receive a nine-level departure.

10        THE COURT:  Thank you, Mr. Reich.

11        Mr. West, do you want to comment on the

12   departure motion?

13        MR. WEST:  Yes, your Honor.

14        Your Honor, as the Court knows from the papers

15   that we filed in this matter, the defense is entering

16   into a joint recommendation in support of the 5K

17   departure motion and the nine-level reduction to level

18   21 with the recommended sentence that I'm sure the

19   Court will get into subsequently.

20        I would say that based on my own understanding

21   of the steps that were taken with the Google

22   investigation that Mr. Reich has accurately detailed

23   for the Court my understanding of the extent of

24   Mr. Whitaker's cooperation in this matter.

25        I, from my own part, have been representing him

1   since I believe 2008, and he has been housed at the

2   Wyatt Detention Facility for the last 44 months, I

3   believe, as of now.  It's a difficult incarceration,

4   not a BOP facility.  He diligently performed this work,

5   your Honor.  I believe that in the undercover phase

6   over 1100 hours of work that he was counting went into

7   his level of cooperation in support of the Government's

8   effort and further work thereafter but certainly in

9   that very active phase.  It was complicated work.  It

10  wasn't work that anyone could have done.  It was work

11  that required him to apply his mind for extended hours

12  each and every day that he was doing it and in a

13  creative capacity.  It had field aspects to it where he

14  would be in contact with the other side of the

15  equation, if you will.

16          So Mr. Whitaker's work in this regard was

17  pervasive.  I can't add to the Government's

18  quantification of it.  I think it says it all that this

19  could not have happened but for what he did to make

20  this undercover investigation work out.

21          Your Honor, the 5K reduction is a significant

22  reduction, but I hope the Court will bear in mind in

23  contemplating it that it does not result in a sentence

24  wherein Mr. Whitaker would be free of incarceration.

25  So he still is going to have to serve time under the

1    Government's recommended 5K motion.  I hope the Court

2    will bear that in mind as well.  Thank you.

3         THE COURT:  Thank you, Mr. West.  All right.

4    I'm going to accept the Government's recommended

5    downward departure of nine levels.  It is a very

6    significant departure, extraordinary departure in many

7    ways; but having observed from a distance this matter

8    for the last three plus years, there's no doubt that

9    the Defendant has displayed a level of assistance to

10   the Government that is significant, and maybe

11   extraordinary, resulting in the $500 million

12   non-prosecution agreement.  I don't think there's any

13   question that everything Mr. Reich described is an

14   accurate depiction of the level of that cooperation and

15   the significant result needs to be accounted for in

16   determining the level of departure.

17        So a nine-level departure would place the

18   Defendant in a level 21.  And at criminal history

19   category of 5, his guideline range would be adjusted to

20   70 to 87 months of incarceration.

21        So with that, then, I'll turn it back over to

22   you, Mr. Reich, to set forth your recommendation with

23   respect to the appropriate sentence.

24        MR. REICH:  Your Honor, as I stated before,

25   there are a number of factors that we have taken into

1   consideration in trying to determine what would be the

2   appropriate recommendation here.  And amongst them

3   is -- are the factors we just set forth with respect to

4   Mr. Whitaker's cooperation.

5        In addition to that, in considering the

6   appropriate recommendation here, we have considered all

7   of the factors that are set forth in Section 3553(a),

8   which sets forth some of the circumstances that the

9   Court is to consider in fashioning an appropriate

10   sentence.  And the first and what we believe is the

11   most important consideration are the nature and

12   circumstances of this particular offense.

13        We have great concern in this case and have

14   since our investigation of the underlying offense

15   concerning the activities of the Defendant's company,

16   Mixitforme.  We've had very great concern about the

17   impact this case has had on the various victims who

18   were defrauded in the Mixitforme fraud that this

19   Defendant was responsible for.  And as the Court knows

20   from the presentence investigation report, the

21   Defendant engaged in a business where he failed to

22   deliver products to many customers who had paid

23   millions of dollars to his company for an electronic

24   product that was never delivered to them.  There were

25   approximately 83 business customers that were defrauded

1    in this case and that they have reported over $7.5

2    million in losses.  And they engaged in numerous

3    transactions with the Defendant.  False statements were

4    made to them about Mixitforme's relationship with

5    certain distributors.  They were given false reasons

6    for why deliveries were not made.  And during this

7    entire period of time that these business victims were

8    being defrauded, the Defendant himself was taking this

9    money and using that money for his own personal benefit

10   in order to have some very extravagant personal

11   expenses for himself.

12        These various business customers have been very

13   severely impacted, both financially, emotionally, and

14   we certainly have put great weight on the impact to

15   those victims in trying to come up with an appropriate

16   sentence.

17        In addition to those particular victims, another

18   victim in this case was a company, Nova.  Nova was a

19   company that acted as the credit card processor for

20   Mixitforme.  They decided to take on that role based on

21   false information that was provided to them by

22   Mr. Whitaker and other people that were involved in his

23   business enterprise.  And at the end of the day, they

24   were defrauded of approximately $2.2 million.

25        So as I said, the impact that the underlying

1    case involving Mixitforme and Mr. Whitaker's activities

2    is of great concern to us, and we certainly put great

3    weight in the impact that this case has had on those

4    victims.

5          In addition to coming up with the appropriate

6    recommendation, we have considered both the Defendant's

7    criminal history and his personal characteristics.  We

8    believe that Mr. Whitaker must be punished for the

9    conduct that he engaged in.  We also think that a

10   sentence must be fashioned which both deters

11   Mr. Whitaker from engaging in similar type of conduct

12   in the future and also deter other people who may be

13   out there thinking of defrauding people.  We need to

14   send a strong message to those individuals also.

15         We think that the restitution, which we are

16   going to be recommending in this case, is extremely

17   important, and we are going to be asking that the Court

18   impose full restitution to all of the victims in this

19   case.  And it is certainly our hope that Mr. Whitaker,

20   once he is released from prison, will be able to start

21   in some fashion making restitution to those various

22   victims.

23         So based on all of these considerations, we are

24   recommending a sentence of 70 months incarceration,

25   we're recommending supervised release of five years,

and we're recommending that the Court order full restitution in this case to the 83 customers who are listed in the Presentence Investigation Report. We would ask that the restitution be according to the numbers that are set forth in that report, and those victims have reported losses in the amount of $7,848,662. So we would ask for full restitution in that amount and then we would ask that the Court order full restitution to Nova, which has reported losses in the amount of $2,216,737. And we would ask that that portion of the restitution be ordered joint and several with Cory Johnson, who is the other individual who was engaged in the activities of the Mixitforme company.

We're not asking for any fine in this case because it does not appear that Mr. Whitaker has the ability to pay a fine; and we also, if the Court follows our recommendation, we also know there will be a very large sum of money that Mr. Whitaker is going to have to pay to these various victims.

And finally, we would ask for a special assessment in the amount of $400. That is our recommendation, your Honor.

THE COURT: Thank you, Mr. Reich.

Mr. West?

MR. WEST: Thank you, your Honor.

1    Your Honor, we believe that -- first of all, let

2    me reiterate that the defense is engaging in a joint

3    recommendation for a sentence of 70 months in this

4    matter, based largely on some of the considerations

5    that Mr. Reich has already detailed.

6    Your Honor, in doing so, I recognize that we're

7    not arguing for a time-served sentence in this case.

8    We're arguing for a sentence where Mr. Whitaker will

9    have to continue to serve time in prison.  I think that

10   the sentence as I've written in my sentencing

11   memorandum, which has been filed in this Court under

12   seal, the sentence strikes a balance in this case

13   between the need -- the 3553 elements.  The first is, I

14   would say, incapacitation.  One of the principles of

15   Federal sentencing is to take a defendant who has

16   committed certain acts, take him out of society for a

17   period of time under the thesis that he can't commit

18   those acts while he is incarcerated.

19   The Defendant in this instance has served 44

20   months in the Donald W. Wyatt Detention Facility.  And

21   this Court has sat in this district for a long time and

22   knows that that is a highly restrictive life that he

23   spent for almost four years in Wyatt.  And because of

24   the physical section that he's in in Wyatt, he rarely

25   even saw the actual sun during that time period.  A

1    highly restrictive life.  And I think the Court ought

2    to take that factor into account when you gauge the

3    extent of incapacitation or detention that's required,

4    the punishment that's required.

5         Typical defendants would move along in the

6    system much more rapidly.  But for the work that he was

7    doing here, so would have he.  So two edges of the

8    sword, I recognize, but nevertheless a highly

9    restrictive form of detention, and we think that the

10   continued detention up to the 70-month period will send

11   a message to other people who would be inclined toward

12   this type of behavior to the extent that people who do

13   this type of behavior receive messages, it seems to me

14   that Mr. Whitaker's cooperation, as has been detailed,

15   use words like "unprecedented."  I think we use that

16   word all the time nowadays to the point where we don't

17   even give it a real meaning.  But the reality is that

18   the result here is one of the largest in the history of

19   the republic in terms of civil recoveries by the

20   Government for this type of thing.  And that can't be

21   understated.

22        And the other reality is, I think I saw in some

23   of the paperwork that over a billion dollars of sales,

24   not just in the Google environment, but the other

25   related Internet providers have been perhaps terminated

because of this investigation and it results in these
kinds of pharmaceuticals, which did not have the
regulation that the Government requires to make sure
that they're safe.

So these things are without kindred examples,
they're one-off, and that's a product that grew out of
this case and it's an astounding result.  But the
reason I focus on that for the moment is that even so,
even so he did this, he still has to stay in jail and
he still has to serve 26 additional months that would
be required under this sentence.

So I think you're sending a loud and clear
message by this sentence that even if the cooperation
is done here, he's still going to have to pay a price.
And I would hesitate to say who could achieve a
cooperation result that this Defendant has achieved and
nevertheless does a sentence that requires he stay in
jail.  So I think that the issue of sending a message
is loud and clear and done in this case.  So
incapacitation, sending a message to other would-be
perpetrators has been accomplished.

I have said to the Court in my papers that
Mr. Whitaker has medical concerns.  I've outlined those
in detail.  I've attached to the sealed memorandum
reports from Dr. Ablow, report from Dr. Rich, report

1    from Dr. Parsons, and some historical reports that are

2    spoken of in the sentencing memorandum detailing the

3    medical situation with respect to Mr. Whitaker, which I

4    hope the Court will take into account under that

5    section of the 3553 criteria.  I won't go into detail

6    now because of the personal nature and the Court is

7    well apprised of it, I believe.

8          The second point I'd like to make in that regard

9    is I've also put in there a recommendation that we

10   would seek from the Court that Mr. Whitaker in any

11   sentencing that the Court does impose have a judicial

12   recommendation that he be placed in a medical facility

13   within the BOP, and we specifically are requesting the

14   Fort Devens medical facility be designated.  And the

15   reasons for that are several, one of which is that he

16   has a plan to try to come out of incarceration with the

17   view toward seeking employment, obtaining employment

18   and beginning on the pathway to restitution, and that

19   plan focuses in the Boston area.  So it would be

20   facilitating moving -- facilitate a great many things,

21   one of which would be a medical provider will be

22   identified and connected to Mr. Whitaker in the same

23   geographic zone.  There could be overlap in terms of

24   getting him prepared to be released.  And it's

25   critically important, it seems to me, that that be done

1    in this case, and I've outlined those in the filings

2    that we've made.

3            Secondly, it seems to me, your Honor, that this

4    Court could enter an order that would accomplish the

5    maximum effect in a fraud case, and I've detailed my

6    legal argument with respect to this particular

7    guideline section.  And it's perhaps not especially

8    helpful for me to get into a broad guideline legal

9    argument at this stage, but I would just point out that

10   in sentencing for fraud cases, as this Court is well

11   aware because this Court has handled several high-level

12   fraud cases, one of the most salient criteria that the

13   Court likes to achieve is restitution for the victims.

14           So punishment is a big aspect of it.

15   Restitution is a big aspect of it.  And I think in this

16   case we've put in before the Court a detailed plan

17   where Mr. Whitaker could employ some of his skills to

18   gainful employment and begin the task of trying to

19   recoup funds that could be paid to the various victims

20   of the Mixitforme fraud.  And I think that he is

21   uniquely capable in this regard, given what he's proven

22   that he can do to get to work and to start recouping

23   some funds that could be paid out in restitution.

24           And I know that this Court's primary interest

25   with respect to this aspect of the case is for the

1    victims.  The victims here are real.  The losses are

2    significant.  And Mr. Whitaker is remorseful and he's

3    desirous of employing his talents to do exactly that,

4    Judge, to work to achieve restitution.  I think you

5    could effectuate, by striking this balance that we're

6    asking you to strike, the opportunity for him to do

7    that effectively and to use the talents that he's

8    proven that he has without doubt to achieve that

9    result.

10         So I've also requested certain matters that are

11   in the presentence report.  I'll leave those to the

12   Court's consideration.  I can answer any questions the

13   Court may have at this point.

14         THE COURT:  No.  I think you said it all, either

15   in your papers or this morning.  So thank you.

16         MR. WEST:  Thank you, your Honor.

17         THE COURT:  Mr. Whitaker, do you wish to say

18   anything before I impose sentence?

19         THE DEFENDANT:  Your Honor, the work that I did

20   with the FDA task force is what I'm most proud of in my

21   life.  The results of what we did, it had a great

22   effect.  But beyond that, on a more personal note,

23   Jason Simonian and the agents that I worked with, they

24   taught me a lot about how to be a better person and how

25   to use my talents in a positive way.  They taught me

the true value of honesty and integrity. From what I
saw, they practice these qualities every day.

In the beginning of my case, I felt like I was
the victim. As I continued to work with these guys, my
perspective changed. I now understand who the real
victims are, and how I caused them to suffer. They say
that actions, that they speak louder than words. And
I'm sure that many people have stood here and said,
"I'm sorry." But I have a greater responsibility than
just saying those words. I've hurt a lot of people,
and I've made a mess of my life.

My apology, your Honor, would be to change and
in every way that I can to give back for what I've
taken. Thank you, your Honor.

THE COURT: Thank you, Mr. Whitaker. You may
remain standing.

Well, this is an extraordinary case and for so
many reasons, and all of them have been eloquently
discussed by counsel this morning and by you. So I'm
going to keep my comments rather brief, I hope. But
the matter, this matter has been in this Court for I
think three-and-a-half years or at least from the date
of your plea, I believe, and I've observed from a
distance the work you've been doing, not really knowing
until the end what you were really doing in terms of

1    your cooperation and that's been spoken of in detail.

2         The bottom line from my point of view is that I

3    think the recommended sentence of the Government and

4    your counsel is an appropriate recommendation, and I'm

5    going to accept it and I'm not going to -- while I have

6    the ultimate decision-making power with respect to

7    determining what the sentence should be, I, in this

8    case, am putting a lot of weight on the recommendations

9    of the Government and your counsel and the fact that

10   it's a joint recommendation because of the nature of

11   everything that's gone on here, and I am very reluctant

12   to modify that recommendation.  But I do want to make

13   clear that my decision is an independent decision

14   because I think it is exactly the right balance and

15   what needs to be achieved here is a balance because

16   what we have is a crime that was a significant,

17   sophisticated white-collar crime that involved an

18   extraordinary amount of loss to a great number of

19   people and businesses.

20        So on one hand, the crime is very serious and

21   needs to be met with a serious punishment; and on the

22   other hand, the cooperation and the work you've done

23   over the course of the last several years is also truly

24   significant and extraordinary and needs to be

25   recognized.  And so in this case, there truly is a need

for a balanced sentence, and I think that the
recommendation of 70 months of incarceration, a total
of 70 months is exactly the right balance.  So I give a
lot of credit to the United States Attorney's Office
and to Mr. West in coming up with a kind of
recommendation that does such a good job of balancing
all of the factors that need to be considered in
determining the appropriate sentence.

Now, one thing that's sometimes a concern in
white collar cases such as this is that individuals can
use the same talents that they used in committing the
crime to sort of buy their way out of serving the
sentence for that crime.  Once again, I think this
sentence does not allow that to happen.  I think it
does account for the seriousness of the crime, and, as
has been pointed out by counsel, it does send the
appropriate message.  And there's always a question of
whether people who are potential wrong-doers, do they
get the message or are we all just deceiving ourselves
in that regard in terms of sending a message of
deterrence.

I think particularly in this type of crime
people do notice that if you commit this kind of
sophisticated white-collar fraud, you are going to
serve time in prison and it's not, as Mr. West has

1   pointed out, it's not easy time.  Doing 44 months at

2   Wyatt is, I think, as Mr. West correctly has pointed

3   out, is harder than doing 44 months in another BOP

4   facility, particularly one, perhaps, like Fort Devens.

5          So I think it achieves the goals of sentencing

6   in terms of accounting for the nature and circumstances

7   of the offense, and it accounts for deterrence and

8   protection of the public, and I also think that it's an

9   appropriate sentence with respect to your own

10  individual circumstances, and those have been discussed

11  somewhat here in Court and also detailed in the papers.

12         Mr. West has made a point about my concern in

13  other cases and also in this case for restitution for

14  the victims.  I do put a very high priority on

15  restitution.  In most cases, restitution, particularly

16  where the loss is as great as it is in this case, is

17  hard to achieve.  But I think there's a decent chance

18  that with your talents and abilities and your plan, and

19  hopefully giving you credit for the things you just

20  said with your new vision on life, that there's a

21  decent chance that some of these victims will actually

22  see some restitution.  And I am, of course, going to

23  make that part of the sentence.

24         In terms of recommendations of counsel with

25  respect to the location or designation of a facility, I

1    am going to accept the recommendation of counsel that

2    you be incarcerated in a BOP medical facility.  I think

3    that's appropriate, and I am also going to recommend

4    that it be at Fort Devens; and I've indicated to

5    counsel that I will work with them on a more detailed

6    statement to the Bureau of Prisons with respect to my

7    recommendation in that regard.  And I'll be working

8    with counsel to do that after sentencing is completed

9    today.

10          But I think it is an appropriate -- although you

11   recognize that that decision is ultimately in the hands

12   of BOP, not my determination, but I do think it's an

13   appropriate recommendation to make for several reasons,

14   including the one Mr. West just talked about with

15   respect to attempting to put you in a position where

16   you can provide restitution to the victims as early as

17   possible.

18          So in the matter of the United States versus

19   David Whitaker, the Defendant is remanded to the

20   custody of the Federal Bureau of Prisons for a term of

21   70 months on Counts I, III and IV, and 60 months on

22   Count II to run concurrent, meaning at the same time,

23   as the sentence on Counts I, III and IV.  So the total

24   term of incarceration is as I've indicated and as

25   recommended by counsel 70 months.

1          In terms of supervised release, the Defendant

2     shall serve a term of supervised release following his

3     incarceration of three years on Counts I, II and III

4     and five years on Count V.  As a special condition of

5     his supervised release, in addition to the standard

6     conditions, I'm going to require that you participate

7     in a program for mental health treatment as directed

8     and approved by the Office of Probation and that you

9     shall contribute to the cost of that treatment based on

10    your ability to pay as determined by the Probation

11    Office.

12         I am going to order restitution in the following

13    amounts:  $7,848,662.82 to the victims listed in the

14    probation report.  That is as to Count I.

15         Then as to Count II, $2,216,737.02 to be paid to

16    Nova Information Systems, and this restitution amount

17    joint and several with Cory Johnson.  I'm going to

18    waive interest on the restitution obligation.

19         Finally, there'll be no fine, but there is a

20    special assessment of $400 that you will be required to

21    pay.

22         Now, I believe the plea agreement in this case

23    did waive the right to appeal if the sentence was

24    within or below the guideline range; is that correct?

25         MR. WEST:  That's correct.

1　　　　　MR. REICH:  Yes, your Honor.

2　　　　　THE COURT:  Since the sentence here is within

3　　the guideline range after the departure, the appeal

4　　waiver is in effect.

5　　　　　Is there anything else that we need to cover?

6　　　　　MR. REICH:  No, your Honor.

7　　　　　MR. WEST:  May I have a moment?

8　　　　　THE COURT:  Yes.

9　　　　　(Pause.)

10　　　　　MR. WEST:  Your Honor, I don't know how long it

11　　will take until a designation is made in this matter

12　　and I do know Mr. Whitaker would like to take care of

13　　certain legal matters in the Commonwealth of

14　　Massachusetts.  I don't know if the Court can encourage

15　　the marshals' office to facilitate that.  I do know

16　　he's desirous of being able to attend to those legal

17　　matters.  I note that for seeking your input.

18　　　　　THE COURT:  What kind of legal matters are you

19　　talking about?

20　　　　　MR. WEST:  He has a detainer, I believe, he has

21　　to clear up, a probation matter.

22　　　　　THE COURT:  Well, what needs to be done?

23　　　　　MR. WEST:  He needs to go there, basically.  Be

24　　allowed to go there if it can be arranged through his

25　　counsel.  His counsel in Massachusetts is present in

1  the courtroom and did request that I seek, to the

2  extent the Court is willing to do so, that the marshals

3  cooperate in that regard.

4         THE COURT:  Well, why don't you come up.

5         (Side bar conference off the record.)

6         THE COURT:  All right.  We'll be in recess.

7         (Court concluded at 10:05 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T I O N</u>

I, Anne M. Clayton, RPR, certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk on May 23, 2012, and incorporating redaction of side bar conference requested by the following attorney of record:  George West, in accordance with the Judicial Conference policy.  Redacted characters appear as a black box in the transcript.


/s/ Anne M. Clayton
_____
Anne M. Clayton, RPR


May 23, 2012
_____
Date